UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| **GUERWIN E. WEEKES,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 3:21-CV-00533-SLC |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** *Kilolo Kijakazi, Acting* | ) |
| *Commissioner of Social Security,* | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Guerwin E. Weekes appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1]  (ECF 1).  For the following reasons, the Commissioner's decision will be AFFIRMED.

**I.  FACTUAL AND PROCEDURAL HISTORY**

Weekes applied for DIB in June 2015, alleging disability as of March 1, 2020.  (ECF 10 Administrative Record ("AR") 15, 1306).  The claim was denied on initial consideration and reconsideration.  (AR 150-57).  An administrative hearing was held on April 14, 2016, before administrative law judge ("ALJ") Romona Scales, at which Weekes, who was represented by counsel, and a vocational expert testified.  (AR 41-84).  A supplemental hearing was held on September 27, 2016, before the ALJ, at which a medical expert, Michael Lace, Ph.D., also testified.  (AR 85-121).  On November 17, 2016, the ALJ found Weekes was not disabled for the period of March 1, 2010, though December 31, 2015.  (AR 15-34).

---

[1] The parties have fully consented to the exercise of jurisdiction by the Magistrate Judge.  (ECF 6).

Weekes sought judicial review of the November 2016 decision, and the Court reversed and remanded the Commissioner's decision on September 17, 2018, in Case No. 3:17-CV-00404-JD-MGG. (AR 1633-44). Upon return of the case, the Appeals Council remanded the claim back for a new hearing before the ALJ to address errors found in the November 2016 decision. (AR 1645-50). Another hearing was held before the ALJ on January 28, 2020, at which Weekes, Dr. Lace, and a vocational expert testified. (AR 1536-95). On March 2, 2020, the ALJ again found that Weekes was not disabled for the period of March 1, 2010, through December 31, 2015. (AR 1306-18). Weekes sought review by the Appeals Council (AR 1778-79), but it denied his request (AR 1295-97), making the ALJ's March 2020 decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.984.

On July 26, 2021, Weekes filed a second civil action with this Court, seeking relief from the Commissioner's March 2020 decision. (ECF 1). In his opening brief, Weekes contends that the ALJ upon remand failed to follow the Court's September 17, 2018, Order in re-evaluating the severity of his post-traumatic stress disorder (PTSD), causing reversible error. (ECF 12 at 14-19). The Commissioner timely filed a response brief in opposition to Weekes's arguments. (ECF 17). Weekes did not file a reply brief, and his time to do so has now passed. (*See* ECF 16).

Weekes was last insured for DIB on December 31, 2015, and thus, he must establish that he was disabled as of that date. (AR 311, 1306, 1308); *see Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that he was disabled as of his date last insured in order to recover DIB). On his date last insured, Weekes was thirty-eight years old (AR 311, 1316), and had attended four or more years of college and obtained a bachelor's degree

(AR 48, 280, 1544). He had served in the United States Navy from 2004 to 2010 (AR 1544), and had past relevant work experience as a Navy medical corpsman, which equates to the civilian occupation of emergency medical technician (AR 1587). He alleges disability due to PTSD and anxiety from his service as a corpsman in Afghanistan and Iraq, chronic neck pain radiating into his shoulders (right worse than left) and hands, low back pain, history of ankle deformity, bilateral tendinitis, bone spurs, history of right shoulder disorder, right knee disorder, and degenerative disc disease of the lumbar spine. (ECF 12 at 2-3).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other

3

words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

#### A. The Law

Under the Act, a claimant seeking DIB must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed in substantial gainful activity, (2) whether he has a severe impairment, (3) whether his impairment is one that the Commissioner considers conclusively disabling, (4) whether he is incapable of performing his past relevant work, and (5) whether he is incapable of performing any work in the national economy.[2] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d

---

[2] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks he can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

4

881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The Commissioner's Final Decision

On March 2, 2020, the ALJ issued a decision that ultimately became the Commissioner's final decision. (AR 1306-18). As a threshold matter, the ALJ observed that Weekes was last insured for DIB on December 31, 2015. (AR 1308). At step one, the ALJ concluded that Weekes had not engaged in substantial gainful activity after his alleged onset day of March 1, 2010, through his date last insured. (*Id.*). At step two, the ALJ found that Weekes had the following severe impairments as of his date last insured: PTSD, depression, cervical radiculopathy, history of ankle deformity, history of bilateral tendonitis, history of bone spurs, history of right shoulder disorder, right knee disorder, and degenerative disc disease of the lumbar spine. (*Id.*). At step three, the ALJ concluded that Weekes did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 1309).

The ALJ assigned Weekes the following RFC:

> [T]hrough the date last insured, the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except the claimant can lift/carry 20 pounds occasionally and 10 pounds frequently. The claimant can sit and stand/walk for 6 hours in an eight-hour workday. The claimant can occasionally climb ramps and stairs. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can never climb ladders, ropes, or scaffolds. The claimant is limited to no overhead reaching with the right upper extremity. The claimant can understand, remember, and carry out simple, routine tasks/instructions. The claimant can maintain adequate attention/concentration for tasks. The claimant can interact appropriately with supervisors and superficially with coworkers. The claimant is limited to occasional and superficial contact with the general public. The claimant would work best independently of others, or in smaller teams of 4-5.

> The work must be free of fast-paced production and quota. The claimant is restricted to a single work location. The claimant can manage occasional changes in work setting.

(AR 1311). Given the foregoing RFC, the ALJ found at step four that Weekes could not perform his past relevant work as of his last date insured. (AR 1316). At step five, the ALJ concluded that Weekes could perform a significant number of light exertional jobs in the national economy as of his date last insured, including housekeeping/cleaner, cafeteria attendant, and price marker. (AR 1317). Therefore, Weekes's DIB application was denied. (AR 1318).

### C. Symptom Testimony

Weekes's sole argument on appeal is that the ALJ failed to follow the Court's September 17, 2018, Order to upon remand "give specific reasons [for] the ALJ's credibility analysis" and "consider the testimony of the claimant in assessing credibility and weigh that testimony with the longitudinal record to determine a [RFC]." (ECF 12 at 14). For the following reasons, Weekes's argument fails to overcome the special deference afforded under the law to the ALJ's assessment of a claimant's symptom testimony.

1. <u>Applicable Law</u>

"In determining whether an individual is disabled, [the ALJ is to] consider all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). An ALJ's consideration of a claimant's symptom testimony is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at

6

least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435. *See Ray v. Berryhill*, 915 F.3d 486, 490 (7th Cir. 2019) (stating that with respect to an adverse credibility determination, it is a "rare case in which the claimant can overcome the 'considerable deference' [the court] afford[s] such findings unless they are 'patently wrong'" (citation omitted)); *Green v. Saul*, 781 F. App'x 522, 527 (7th Cir. 2019) (If an ALJ's judgment of a claimant's credibility "was tied to evidence in the record and was not patently wrong, we may not disturb it." (citation omitted)); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's consideration of a claimant's symptom testimony because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Having said that, an ALJ must base her consideration of a claimant's symptom testimony on "specific reasons supported by the record." *Richards v. Berryhill*, 743 F. App'x 26, 29 (7th Cir. 2018) (citation omitted). The regulations require the ALJ to analyze a variety of factors in making a determination of a claimant's subjective symptoms. These factors include: daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medications; any additional treatments an individual receives for relief of symptoms; any non-treatment measures taken to relieve symptoms; and any other factors concerning an individual's functional limitations and restrictions due to symptoms. SSR 16-3p, 2017 WL 5180304, at *7-8.

7

2. The ALJ's Reasoning

Reading the ALJ's decision as a whole and with common sense as the Court is required to do, see Buckhanon ex rel. J.H. v. Astrue, 368 F. App'x 674, 678-69 (7th Cir. 2010) ("[T]idy packaging" is not required in ALJs' decisions because the courts read them "as a whole and with common sense." (citations omitted)), the ALJ identified several reasons for discounting the severity of Weekes's symptom testimony. First, while the ALJ acknowledged that Weekes's emotional symptoms waxed and waned, she found there was no indication of significant concerns or deficits related to Weekes's overall functioning, and that periods of symptom exacerbation "were very short and did not rise to the level of marked or extreme limitations." (AR 1314).

The ALJ also observed that while Weekes's treatment had been significant for management of PTSD and depression, he still was able to maintain daily activities, including attending college full-time (though it took him seven years to complete his degree due to his symptoms), performing household tasks, reading and watching television, caring for his dog, interacting with a few friends and family, attending church, participating in the Farmer's Market, performing volunteer work, and traveling out of the country. (AR 1309-10, 1313-14). Further, the ALJ relied on the opinion of Kent Hershberger, Ph.D., a consultative examiner, who concluded that while Weekes's stress tolerance was "below average" due to his PTSD, he had good social skills, could get along adequately with coworkers and supervisors, would be capable of learning simple new vocational tasks, would be able to understand and recall simple instructions, and could perform simple repetitive tasks that do not exacerbate his physical pain. (AR 1315-16; see AR 797-98).

8

3. <u>Weekes's Arguments</u>

Weekes challenges the ALJ's analysis of his symptom testimony in various respects. First, Weekes argues that the ALJ failed to follow the Court's September 17, 2018, Order "in that her evaluation of the credibility of Mr. Weekes was no different from the first decision authored on November 17, 2016." (ECF 12 at 14). Not so. In the prior decision, the ALJ discounted Weekes's symptom testimony based on an inconsistency with the medical evidence, that he was not always compliant with his medications, his wide range of daily activities, and that while he claimed he had not fully disclosed all of his experiences while deployed, he did in fact disclose details of his experiences in active combat. (*See* AR 24-32,1640-44). As one would expect, the ALJ did reconsider some of the same factors—an inconsistency in severity with the medical evidence and Weekes's wide range of daily activities—but the ALJ no longer relied on Weekes's failure to consistently take medications or that he had, in fact, disclosed details of his combat experience. Instead, the ALJ applied "great weight" to Dr. Hershberger's opinion. (AR 1316). Therefore, Weekes's threshold argument that the ALJ failed to follow the Court's September 17, 2018, upon remand is defied by the record.

Moving on to more specific arguments, Weekes first contends that the ALJ "made blanket statements that there were periods of [symptom] exacerbation . . . . [but] did not address any of the contrary evidence which showed periods of extreme limitations." (ECF 12 at 15 (citing AR 1309-10)). In making this argument, however, Weekes does not cite to any medical evidence illustrative of the "periods of extreme limitations" he claims the ALJ ignored. (*Id.*). It is not the Court's duty to scour the record in search of evidence to support a claimant's arguments. *See generally Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702 (7th Cir. 2010) ("Judges are not like

9

pigs, hunting for truffles buried in [the record]." (alteration in original) (citation omitted)).

In any event, the ALJ *did* cite medical evidence when acknowledging that Weekes at times "reported increased difficulty sleeping and increased nightmares, low motivation and energy, missing work and classes, increased depression due to the loss of his dog, trouble getting along with his parents, and not caring about school." (AR 1313 (citing AR 568, 1146, 1159)). Further, the ALJ observed that Dr. Lace, the medical expert who testified at the September 2016 and January 2020 hearings, indicated in a May 2016 report that Weekes had no "marked" or "extreme" limitations. (AR 1315 (citing AR 1233-34)). Though Dr. Lace acknowledged at the hearing that Weekes had experienced some severe symptoms at times, particularly in 2012, they "were limited to very short time periods . . . ." (AR 1579; *see also* AR 1314). Accordingly, Dr. Lace summarized: "There may be some . . . periods where there's relative situational stress and things leading to increases in symptoms. But . . . nothing that would constitute a year-long period of marked limitation." (AR 1584). Consequently, the ALJ's summation that Weekes's symptoms "waxed and waned" and that "periods of symptom exacerbations . . . were very short and did not rise to the level of marked or extreme limitations . . . ." is an accurate assessment of the evidence. (AR 1314).

Next, Weekes argues that the ALJ did not "fully address" the evaluation of Dr. Hershberger, who examined him on behalf of the state agency in July 2015. (ECF 12 at 15). It is clear, however, that the ALJ thoroughly considered Dr. Hershberger's findings and opinion throughout her decision. When assessing the Part B criteria, the ALJ noted Dr. Hershberger's findings that Weekes had intact memory and general fund of information, good judgment and insight, put forth good effort on the examination, but had poor attention and concentration. (AR 1309-10

(citing AR 794-95)). And when summarizing the medical evidence, the ALJ wrote the following about Dr. Hershberger's evaluation:

> Turning to the claimant's psychological impairments, records indicate the claimant's treatment has been significant for management of PTSD and depression symptoms. The claimant underwent a consultative psychological evaluation on July 6, 2015. The consultative examiner noted the claimant's stream of thought was logical and goal-directed. His attention and concentration were surprisingly poor, given his presentation. He was enrolled at IU South Bend full-time and started last year. The claimant reported that he takes out the trash and does his own laundry. During his free time, he likes to watch baseball on TV. He interacts with his dog. He likes to read articles and novels about history. He attends church every week. His mother and sister are supportive of him. He has one friend in the area but sees[] him only every couple of months. He communicates with a couple of men that he served with once in a while.

(AR 1313 (citations omitted); *see* AR 793-98). Then later in her decision when discussing the medical source opinions, the ALJ honed in on Dr. Hershberger's medical source statement included at the end of his evaluation and explained the weight she assigned to the opinion:

> The undersigned has also considered the consultative examiner's opinion. The consultative examiner opined the claimant is fully oriented and knows what he is doing. His social skills are good and he could get along adequately with co-workers and supervisors. He would be capable of learning simple new vocational tasks. He would be able to understand and adequately recall simple instructions from a supervisor. He could perform simple repetitive tasks if they do not exacerbate his current physical pain. His stress tolerance appears below average at this time based on his PTSD. The undersigned gives great weight to this opinion, as it is consistent with the doctor's own exam findings, as well as consistent with the evidence of record. In particular, the claimant is limited to simple, routine tasks/instructions, as well as no production or quota based work to accommodate symptoms associated with PTSD and depression.

(ECF 1315-16 (citations omitted); *see* AR 793-98).

Despite these paragraphs penned by the ALJ, Weekes argues that the ALJ short-changed Dr. Hershberger's evaluation by failing to consider Dr. Hershberger's observation that Weekes was "tearful and shaky when describing the reasons for his PTSD, was unable to perform serial

11

sevens, did not know how many minutes were in an hour and a half, despite having a college degree and working on a second degree." (ECF 12 at 15 (citing AR 793-98)). Weekes also points to Dr. Hershberger's statement that Weekes was suffering from moderate to severe PTSD and had below-average stress tolerance. (*Id.*).

"But an ALJ need not mention every piece of evidence, so long [as she] builds a logical bridge from the evidence to [her] conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ made clear in her decision that she thoroughly considered Dr. Hershberger's opinion, and she did not do so unfairly given that the ALJ expressly acknowledged that Weekes's PTSD was severe, that his attention and concentration were poor, and that his stress tolerance was below average. (AR 1308, 1313, 1316). Yet, despite these findings, Dr. Hershberger still concluded that Weekes could get along with supervisors and coworkers, could learn new simple tasks, could understand and recall simple instructions, and could perform simple repetitive tasks if they did not exacerbate his physical pain. (AR 797-98, 1315). In crafting the mental RFC, the ALJ heavily relied on Dr. Hershberger's medical source statement, explaining when doing so that she also specifically accounted in the RFC for Weekes's difficulty with handling stress. (AR 1316). As such, the ALJ's consideration of Dr. Hershberger's opinion is not deficient or cherry-picked.

Weekes next criticizes the ALJ's statement that he was involved in church, got along well with authority figures, and has never been fired or laid off as a result of problems getting along with others. (ECF 12 at 16 (citing AR 1309)). He argues that because he has not worked since his alleged onset date, the ALJ's reliance on the fact that he has never been fired or laid off from a job is not substantial evidence. (*Id.*). Weekes's argument, however, amounts to a mere nitpick

of a snippet of the ALJ's discussion.  *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (citation omitted) (stating that the claimant's argument "amounts to nothing more than a dislike of the ALJ's phraseology").  The ALJ's statement more comprehensively reads:

> In interacting with others, the claimant had a moderate limitation.  The claimant reported problems getting along with, and trusting, others because of his PTSD.  He further indicated he does not really interact with others outside of his family, as he rarely communicates [with] others in his unit.  However, per his treatment notes and Function Report, the claimant was involved with his church, got along well with authority figures, has never been fired or laid off because of problems getting along with others, had a close relationship with his parents and siblings, participated in a Farmer's Market, as well as volunteered at a soup kitchen, hospice, local museum, and an animal shelter.  Additionally, the claimant also traveled with classmates to Italy for a month and attended his grandmother's funeral in the Caribbean.

(AR 1309-10 (citations omitted)).  Taken in context, the ALJ made these observations to illustrate the inconsistency inherent in Weekes's claim that he does not interact with people outside of his family.  In actuality, Weekes's daily activities regularly bring him into contact with a variety of people, which undercuts his claim of disabling social limitations.  *See Kornfield v. Apfel*, No. 00C 5642, 2003 WL 103009, at *4 (N.D. Ill. Jan. 9, 2003) (discounting a claimant's credibility due to her inconsistent statements).

Weekes also contends that the ALJ erred by having Dr. Lace, the medical expert who testified at the September 2016 supplemental hearing, also testify at the January 2020 hearing.  (ECF 12 at 16; *see* AR 103-14, 1571-85).  As Weekes sees it, Dr. Lace "did not change his opinion in any way" because he "was not going to overturn his own prior opinion."  (ECF 12 at 17).  Weekes also faults Dr. Lace for referring to Global Assessment of Functioning (GAF) scores, asserting that they "are no longer considered medically acceptable measures of mental health . . . ."  (*Id.* at 18).

13

Weekes's argument that Dr. Lace "was not going to overturn is own prior opinion" is mere misplaced speculation. "The regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist[s] are experts in their field and the ALJ is entitled to rely on their expertise." *Ottman v. Barnhart*, 306 F. Supp. 2d. 829, 839 (N.D. Ind. 2004). Nor did Dr. Lace's reference to the GAF scores of record render his testimony unreliable. (*See* AR 1580, 1584; *see also* AR 1316). GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., text rev. 2000). While "[t]he American Psychiatric Association no longer uses the GAF as a metric[,]" *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)), several clinicians of record used GAF scores in assessing Weekes, so they are relevant to the ALJ's decision. (*See, e.g.*, AR 573, 949, 959, 1233); *see Spencer*, 2015 WL 684545, at *17 n.5 (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)). Therefore, Weekes's argument challenging the ALJ's reliance on Dr. Lace's opinion is also unavailing. In any event, the ALJ acknowledged that "the GAF scores are not dispositive . . . and represent [only] a snapshot with respect to [Weekes's] functioning." (AR 1316).

In sum, contrary to Weekes's assertion, the ALJ sufficiently followed the Court's September 17, 2018, Order when reassessing Weekes's symptom testimony on remand. The ALJ adequately "buil[t] a logical ridge from the evidence to her conclusion[,]" *Schmidt*, 395 F.3d at 744, and based her assessment of Weekes's symptom testimony on "specific reasons supported by the record," *Richards*, 743 F. App'x at 29 (citation omitted). As such, the Court will afford the ALJ's assessment of Weekes's symptom testimony the special deference it is due

and affirm the Commissioner's final decision.

## IV.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED.  The Clerk is DIRECTED to enter a judgment in favor of the Commissioner and against Weekes.

SO ORDERED.

Entered this 14th day of July 2022.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge
